Francisco Delgado, Plaintiff and Appellee, *v.* Elvira Mercado, Defendant and Appellant.

No. 8369.   Argued April 21, 1942.—Decided June 18, 1942.

*Villamil & Santana Becerra* and *Pedro Juan Alcalá* for appellant. *Dubón & Ochoteco* and *Otero Suro & Otero Suro* for appellee.

Mr. Chief Justice del Toro delivered the opinion of the court.

This is an action for divorce brought by the husband against the wife on grounds of cruelty and abusive language, which was decided in favor of the husband. The wife appealed and the remedy was made seasonable. The Fiscal recommended the reversal of the judgment, and the case was finally submitted to this court for decision.

In the complaint plaintiff avers that he was married to defendant in Aibonito on April 16, 1919, that a son was born who is now seventeen years old, and that, without any cause whatsoever, from the very beginning his wife started to mistreat and greatly abuse him, insulting him both privately and publicly, and assaulting and battering him frequently, in such a fashion that his health was greatly affected, until on or about June 1936, at which time plaintiff, being in fear of losing his life, decided to separate from his wife.

In her answer, defendant admitted the marriage and the existence of the son, but denied that she had insulted, abused, assaulted or battered her husband. As a special defense she averred that plaintiff had previously abandoned her temporarily on two occasions to live with other women, returning to the home when for one cause or another said

concubinage ended, and that her husband has tried several times to obtain a divorce from her in order to be able to fulfill marriage promises, but she has refused.

The cause was tried. The evidence was submitted and the lower court, after making reference to such evidence in the statement of the case and in the opinion, said:

"From the study and analysis that we have made of the evidence in this case, we reach the conclusion that the behavior of defendant has made the conjugal life of the parties impossible, said conduct being of such a nature that it has destroyed the spiritual well-being and happiness of the plaintiff and has frustrated the legitimate ends of marriage.

"Defendant's acts and her remonstrations against her husband are of such a nature that the uneasiness caused by them is in itself cruel treatment. Said words were not uttered by defendant in the heat of passion; rather, they are the result of a constantly odious and rancorous disposition, and they were pronounced with the sole purpose of ridiculing, offending and mistreating the plaintiff.

"One of the grounds for divorce established by our Civil Code is 'cruel treatment or grave injury'. (Subdiv. 4, §96, Civil Code, 1930 ed.)

"We are of the opinion that the phrases and words directed by defendant toward plaintiff on various occasions, as demonstrated by the evidence, are grossly offensive insults that reveal the purpose of stigmatizing or underrating the plaintiff, and which embody the 'animus injuriandi.'

"The third averment of the special defenses pleaded under oath by defendant in her answer corroborates our conclusions, sustained by the evidence, with respect to the persistent purposefulness of defendant to abuse her husband, by imputing to him the commission of acts of adultery on two occasions and the birth of children as a consequence thereof. This averment remained wholly without proof.

"After weighing all the evidence submitted by the parties, and judging that the preponderance of the same is in favor of the plaintiff, the complaint will be sustained."

The rules of this court, Code of Civil Procedure, 1933 ed., page 315, provide that the court will order a careful examination by the *Fiscal* of the records in divorce cases and a type-

written statement of the material facts and legal principles involved, together with his recommendations as to the action that should be taken by the court, and his opinion with respect to the effect of such action upon public morals under all the circumstances shown upon the record.

In fulfilling said official duty, the *Fiscal* of this court rendered his report. The last paragraph of same reads as follows:

"It is true that the generally accepted doctrine is that this Honorable Court will not interfere with the conclusions of fact reached by the judge of the lower court unless passion, prejudice or partiality, or a manifest error, are shown to have been committed. It is likewise true that between the instant case and the case of *Gómez* v. *Trujillo,* cited by us, there exists the difference that the judge who rendered judgment in the latter case was not the same judge who heard the evidence, but decided the case upon the transcript of record submitted to him by the parties; but even granting the existence of the accepted doctrine and of the fact which differentiates both cases, in the instant case there exists, in our judgment, such manifest error in the weighing of the evidence submitted that in our opinion this Honorable Court would be justified in reversing the judgment."

We think the *Fiscal* is correct in his conclusion. As soon as we start reviewing the evidence, we find the cause of the marital disagreements. The first witness was the plaintiff himself. He is a professional photographer who was married at Aibonito in 1919 and established his residence in Guayama, where he took charge of certain work in the Martínez drugstore. His wife turned up at his working place telling him that she did not want to be alone. He was very irritated. She told him that she wanted to leave Guayama "because she suspected that I had other 'affairs' ".

She said that what she wanted was to leave for the United States; that for said reason she married him. They went to Ponce where he worked in the Tejera photographic studio. The quarrels continued. She became ill and they went to Aibonito. Later on they lived in Yauco where the first sepa-

ration occurred. As testified by the husband, they were at the dinner table when they heard a motion picture being advertised and he invited his wife to go to see it. She accepted the invitation, but he had to leave the house to buy some sugar and was delayed because some gentleman started a conversation about a job. When he returned, she had changed her clothes, and told him that he was a scoundrel, that he had left her all prepared to go out, that such was not the way to treat a lady, and that she knew that he had been in the company of other women. Afterwards, about nine thirty o'clock at night, she changed her mind and said: "Let us go to the movies." He refused. She then took the newspaper that he was reading and said: "You will go to the movies or my name is not Elvira." He talked back to her, shoved her, she fell and yelled a lot. He tried to console her and on the following day she begged to be forgiven. That he did, but two or three days later the same thing happened and he left for Humacao.

They reunited and lived together again. They established their household in Río Piedras, where she said that she would take interest in her work, since their separation was imminent and in the long run they would separate.

She wanted him to buy her a small farm. They went to look it over together with their son and a Mr. Noya. An accident occurred and Noya, the plaintiff and his son, were wounded. They were taken to a clinic in Caguas, where she stayed up all night. They were transferred to another clinic in Río Piedras and she went to see them every day. She asked him for the insurance policy and on the next day, when she returned, she greeted her son and then addressing him she said: "Here is your policy, you indecent dog, I am not coming back." A nurse was present and he was greatly ashamed by the occurrence. He later found out through his son that his wife's attitude was due to the fact that he had not made her the beneficiary, of the policy.

When he left the clinic and went home, his wife failed to greet him and continued on working. He asked her to explain her attitude and she refused. Later on she said: "You should perish. I do not know what heavenly hand prevented you from dying." Since he felt weak, he asked for some fruit juice, but to no avail; and that same day he left the house forever.

He secured employment in the PRRA, and there she went after him. Upon leaving the office she said: "Did you think that I would not find you? Do not hope for a reconciliation. I am here to mortify you and to make you leave this place," and he responded: "Look here, Elvira, this is Federal property and they are going to throw you out of here." She would call him "senile old man, roving photographer." The same thing happened again. Everybody was looking forward to her visits and when she did not show up they would say: "She is not coming today." He was very ashamed. One day she threw an umbrella at him. On another occasion he had to avert a scandal because she wanted to force her way in and a guard was stopping her.

Such is the situation as described by the husband, with greater extension and detail, of course, in his testimony which covers sixteen pages of the transcript of the evidence.

The next witness was newspaperman Tomás de Jesús Castro, likewise an employee of the PRRA, who, in or about 1937, was assigned together with the plaintiff to the task of preparing illustrated reports. He testified: ". . . I saw Mrs. Delgado in the locality of the PRRA about three times. Every time she went there she would stir up an abnormal situation; she would express herself in violent terms and at times the girls working in the office would converge on the windows to watch what was happening below. . . I saw a watchman escort her out of the PRRA. . . Her attitude was one of complete nervousness; you could see that she was excited, and a person in such an attitude can not be very well disposed. With respect to Mr. Delgado she would allege that

this man does not help me, he has abandoned me. That is all that I remember. . . .''

The plaintiff was again called to the stand, and answering his attorney he said that as a consequence of his wife's attitude he could not work efficiently, he would fall back on his work, and his clientele was dispersing. He would stay awake at night, and lost a lot of weight. His life was hellish. On cross-examination he admitted that his wife worked with him in Río Piedras. He said that his wife's attitude was a proper subject for scientific investigation. He never gave her any motives for reproach. He admitted that he had ''official'' relations with Leticia Arreche, but denied having had ''amorous'' relation with her. He knew Laura Torres, but denied that he carried on a love affair with her. Perhaps she had relations with his son, whom she called ''Pancho''. It is not true that the divorce action which he filed at Humacao in 1938 was due to the relations that he carried on with Leticia Arreche. It was due to the scandals of the PRRA.

Witness Francisco Navarro, Jr., testified that while he was a student at the University he was able to appreciate that the relations existing between the plaintiff and defendant in Río Piedras ''were not at all cordial and were very strained. The wife complained that her husband was always falling in love and she said that he was a shameless cad.''

The last witness was Aurelio Miró, a watchmaker seventy-seven years old. He made the acquaintance of Mr. and Mrs. Delgado Mercado in Guayama and Río Piedras. In Río Piedras he had his workbench in the same locale with plaintiff's photo studio. He witnessed many of their quarrels, and ''always saw the wife insulting her husband.'' She would call him ''dog'', ''cad'', and she would say to him ''You are worthy of being killed'', ''I do not want to have anything to do with you.'' On cross-examination he said that he traded in pieces of old gold and silver, and that he would then melt them. He did not have a Federal permit to trade in gold.

The evidence submitted for the defendant began with the testimony of the wife, Elvira Mercado de Delgado. She was asked if she had heard Miró's testimony and she answered that she had, adding: "He came to my house and placed a workbench to fix watches and started to bring silverware and pieces of gold and coins. In my house we had a small electric motor which he used to melt all the metalware. After 15 or 20 days had gone by, I realized that the secret service was out looking for him because he was in an illicit trade, so the gossip went. He himself told me that the secret service had accused him, and that he wanted to sell out before they took his things away from him, and then I counseled my husband to throw him out of the house." As a matter of fact, he left.

She likewise said that she had heard the long story told by her husband. What he said is false. Their quarrels were not in public. They arose "because I would admonish him and because I found all the letters written by Laura Torres, and I would tell him that I could not go on living that way and he would get all excited, but there was no scandal." "I know that he has a daughter who lives in the Phalanstery and who is being brought up by an aunt. I know that she is his daughter because he received a letter from the girl's mother from Guayama." She made reference to another letter addressed to her husband by Leticia Arreche while he was working at the PRRA; Laura Torres did not have any relations with her son, "no, sir, it was with Delgado." "He went to visit her at Lares a few times and I saw him strolling around the University with her."

For these reasons they quarreled. No economic questions were involved. They worked together. "After three years of marriage I began to work with him. . . I support myself that way." She denies that any guard had escorted her out of the PRRA. Her son, as well as the son out of her husband's first marriage, who live with them "have always been very affectionate toward me."

Coming back to the Arreche affair she said: "They told me and I received that letter, and then, since a distinguished person was involved, I went to the offices of the railroad company and spoke to don Manuel, her foster father. I said: 'Don Manuel, I have received this letter and I have come here to prevent a social scandal'. He read the letter and told me that it was impossible because he had talked to Delgado and the latter had denied that he was carrying on a love affair with her. He read the letter and was greatly affected by it." She added that on two occasions, once alone and once while in the company of Dr. Quevedo, her husband tried to obtain the letter from her.

She testified that when the automobile accident occurred, she used to go to the clinic every morning at six o'clock to bathe her husband and her son; that she sprained an ankle and went to the Municipal Hospital for treatment in order not to worry him. That she received a notice about the policy. He thought that the premium was unsatisfied. She had paid it on time by borrowing money. When he was released from the clinic she sent an automobile there but he had left. That afternoon he returned to the house and told her that he had been to the PRRA on business. In response to the question whether she had heard her husband testify on the complaint for divorce filed at Humacao, she answered: "Yes, because he was carrying on a love affair with Rosa Piñero and he was anxious to marry her, and he has a daughter by her living in the Phalanstery."

Gregorio Picard, who for various years worked at the house of plaintiff and defendant, testified that he never witnessed any violent quarrels between them.

Eligio Mercado, brother to the defendant, was the last witness, and he testified that he often went to the house of the plaintiff and his wife and never witnessed any disagreements; that plaintiff was very friendly to him and that "on many occasions he talked to me about her health. I wish

that the court would ask her to leave the courtroom so that I may explain myself more fully.''

Defendant withdrew from the courtroom and the witness continued: ''On various occasions Mr. Delgado has suggested to me that my sister had an ovariotomy performed upon her and that for that reason, and the additional reason that he is a young man, he needs another woman who is capable of satisfying his lust.''

The documentary evidence submitted consists of three letters addressed to ''Pancho'' and signed ''Laura'', and another one dated June 9, 1937, which starts ''Darling'' and is signed by ''Doña Pitinga''. All of them reveal amorous relations. In the last letter there is a paragraph which reads: ''After your divorce, we are really going to make a time of it!''

In rebuttal plaintiff offered the testimony of José P. Rivera. This witness testified that he was an employee of the PRRA, and that on two or three occasions he saw defendant in the photographic laboratory of this agency.

Undoubtedly, if we are to believe the plaintiff and his witnesses, the conclusion is inescapable that defendant repeatedly insulted her husband both publicly and privately. But even then, said insults do not constitute, in our judgment, a cold and deliberate injury on the part of the wife, rather they are more in the nature of violent and passionate utterances provoked by the husband's behaviour, in accordance with the education, temperament, and health of the wife. To say that because a wife may say to her husband in the course of a quarrel ''you should have died'', she really hopes for the occurrence of that eventuality or would do something to bring it about, is not consistent with human nature.

In the evidence submitted by plaintiff we find the motives for defendant's attitude, as we remarked in the beginning when we analyzed plaintiff's testimony. From Guayama, where the couple initially established their residence, the wife's distrust arose because of the relations that her hus-

band carried on with other women. This situation was the same when they went to Yauco, and when they lived in Humacao, and Río Piedras.

From the testimony of Castro, who worked with and was a friend of the husband at the PRRA, it appears that the wife felt that she had been abandoned; and with reference to Miró's testimony, expressly mentioned in the opinion of the lower court as being worthy of great credibility, we later on find out, through defendant's testimony, the reason why Miró took his trade out of the premises wherein the spouses' photo shop was situated in Río Piedras.

Above all else, the fact that the wife at no time abandoned the home speaks for itself. It was the husband who, through his own determination, left without sufficient justification.

If, after having analyzed the evidence submitted by the plaintiff, we pass on to examine the evidence offered by defendant, then the sole and fundamental cause of the quarrels appears with such clarity that such evidence may not be disregarded. The averments in the answer relative to the amorous relations of the husband with other women were not wholly without proof. As we read the wife's testimony, we are convinced of the reasonableness of her suspicions as confirmed by the letters addressed to her husband, which she found within her own home.

We do not mean to say that defendant's behaviour is praiseworthy. It is not the sort of conduct to be imitated, because of its many shortcomings. But from the record it appears that she was faithful, that she learned her husband's trade, and that she helped him in the upkeep of their home. It likewise appears that she knew how to take care of her son and of her husband's legitimate son, and that with her toil alone she has been able to sustain herself after her husband abandoned her.

The incident about the insurance policy is readily susceptible of explanation, even if it had occurred as told by the

husband. A woman like defendant, who makes sure that her husband's insurance policy remains outstanding and goes to the extent of incurring in debt to pay the premiums, and who suddenly finds out that her husband has omitted her as a beneficiary of the policy, is very likely to feel hurt, not only for the privation of future protection due to her, but also for the lack of love which her husband's action implies.

Under the circumstances of this case, to grant the divorce sought by the husband would be tantamount to rewarding his inconstancy, satisfying his desire to sever the marital ties because he cannot lead his life as he understands it should be led, and opening the way to the destruction of homes through the willful intent of one of the spouses, by means of copious testimony corroborated by prejudiced persons and friends.

It is quite possible that as a matter of fact the wife would be happier and freer without a husband who does not find in her the satisfaction which he cherished, but she has raised her inconformity, and, since the law is in her favor, the courts must uphold her. See *Kennerley* v. *Kennerley,* 29 P.R.R. 723; *Gómez* v. *Trujillo,* 59 P.R.R. 470, and cases cited therein. As it was resolved in the first of the decisions cited "Divorce is a remedy for the relief of an injured spouse who has not been the voluntary procuring cause of the acts relied upon to invoke it, and it is not available for one who, disregarding the solemnity of the nuptial vows, prompts the other party to the marriage to conduct which would be inexcusable if committed against a husband or wife who was honestly endeavoring to sustain the marriage relation; therefore, where the misconduct of the defendant is the result of the ill conduct of the plaintiff, the court will not decree a separation."

The judgment must be reversed and the complaint dismissed, with costs.